## Case No. 8,983.

### The MAJOR BARBOUR.

[Blatchf. Pr. Cas. 167.] [1]

District Court, S. D. New York. May 28, 1862.

PRIZE—VIOLATION OF BLOCKADE—NECESSITY—ENEMY PROPERTY.

1. A clear necessity will justify an entrance into a blockaded port, but satisfactory evidence will be required of the reality and urgency of the necessity.

2. Vessel and cargo condemned as enemy property, and for an attempt to violate the blockade.

1 [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

1 [Reported by Samuel Blatchford, Esq.]

In admiralty.

BETTS, District Judge. The libel of information avers that the vessel and cargo were captured as lawful prize, January 28, 1862, at the mouth of the Grand Caillou bayou, on the coast of Louisiana, by the United States steamship De Soto. The prize was sent in charge of a prize-master and crew to this port, and was delivered to the prize commissioners here, February 21, 1862. The firm of Prooss & Oliveros intervene and answer the libel, and claim portions of the cargo, as subjects of the queen of Spain, and residents of Havana, in Cuba. No other claim is filed. No regular bill of sale, or registry, or other original document, verifying the title or true ownership of the vessel, was produced from the vessel, or on the trial. The only papers relating thereto, found on board of her at the time of her capture, were a certificate of the British consul at New Orleans, dated June 6, 1861, stating that the vessel was built in New Jersey, in the United States, and registered at the port of New Orleans, September 20, 1856; that J. Roberts is her master, and that John Bronasses, of the city of New Orleans, has purchased all the shares in the vessel. That certificate was indorsed at Havana, by the British consul, June 26, 1861. Its effect is continued, by a subsequent indorsement to December 6, 1861, and is again continued by an indorsement made under the previous one, by the British consul at Havana, until March 6, 1862, by which time, as it states, "the vessel must proceed to a British port, to be registered." This last entry was dated January 17, 1862, and was made about a week previous to the seizure of the vessel.

The only further documentary evidence found on the schooner, respecting her nationality or individual proprietorship, consists of two "agreements for foreign-going ships," or shipping articles, in the names of the master and crew of the vessel, on the outward and return voyage in question. The first one is a printed form, filled up, in manuscript, with the names of the master and crew, and the date of its execution, and a description of the intended voyage. It purports to have been executed at New Orleans, December 3, 1861, by James Roberts, captain, two mates, five seamen, a cook and a steward, and to be for "a voyage from New Orleans to Havana, and any other port or ports where freight or cargo may offer, at the discretion of the master, and back to a final port of discharge in one of the British colonies, for a time not to exceed six calendar months." The other agreement is drawn up in manuscript and is substantially of the tenor of the printed one, containing the same complement of men, but with a change of four names. It purports to have been executed at Havana, January 10, 1862, and is for a voyage from that "port to Matamoras, and from thence to a port of discharge in

the West Indies." The capture of the vessel and cargo took place in the vicinity of the mouth of the Mississippi, eighteen days thereafter.

An account of the voyage was given on the preparatory examination, February 27 and 28, by the master and mate of the vessel, one seaman, and two passengers. They were present at the capture. The master and seaman have resided in New Orleans twelve or thirteen years, and are British subjects. The mate is unmarried, is a native of the state of New York, and has no particular residence. The two passengers are Spanish subjects. One, Morey, has resided eleven years in New Orleans, and is married; the other, Prats, is a single man, who lives in Havana. One of the passengers, Prats, for himself and firm, claims a portion of the cargo. No claimants have intervened for the residue of the cargo. The other witnesses testify that they had no interest in the vessel and cargo. They concur in stating that the capture was made February 27, or 28. a short distance off the western coast of Louisiana; that the vessel belonged to John Bronasses, of New Orleans, who appointed the master; that she had been carrying all kinds of cargo generally between New Orleans and Havana; and that her last clearing port before her capture was Havana. The captain says that a Spanish house in Havana were the ship agents there, and obtained the cargo, consisting of coffee, cigars, salt, cases of merchandise and boxes of powder, and other boxes, barrels and bales, the contents of which he does not know; that he does not know that they have any interest in the cargo; and that he thinks that the owners of the cargo reside in Matamoras. The vessel, after leaving Havana, touched at no other port before her capture. She sailed under the British flag. The captain says that he knew of the blockade of the Southern ports before he left New Orleans, but did not know that Grand Caillou, where he was trying to put in, was blockaded. No warning or notice of such blockade had been given him. He says that he was going into Grand Caillou because he was in a leaking condition, in consequence of a heavy gale which had been raging for about forty-eight hours; and that, for that reason, the vessel, before and at that time, was sailing wide of Matamoras, and was going into Caillou, which was the nearest port. The mate says that the vessel had always carried general cargoes, similar to her present one, and has generally delivered them at the same place, about twenty-five miles up the Caillou river; that he knew, and supposed the captain did, that Louisiana was at war with the United States, and that New Orleans was blockaded by United States vessels; and that he did not know of the blockade of the mouth of the Caillou, where the vessel was attempting to enter, and had never been warned off or had notice of such blockade.

He says that the voyage was a round voyage, commenced at Caillou river on or about the 11th of December. The statement by the mate, of the course run by the vessel on her voyage, varies materially from that asserted by the master. The captain says: "The course, at all times when the weather would permit, was directed for Matamoras. The reason I was going into Grand Caillou was, because I was in a leaking condition. The vessel was sailing wide for Matamoras, and we were going into Caillou for that reason. It was the nearest port." The answer of the mate to the same interrogatory is: "Her course was not, at all times when the weather would permit, and was not at the time of her capture directed to Matamoras, where she was destined by the ship's papers. We were upwards of 300 miles from Matamoras. Her course was altered for Caillou river on the morning of the day we were captured, I suppose for the purpose of entering that river and making a landing. It may have been for the purpose of discharging cargo, or for some other reason; I cannot say."

The question, whether the vessel was off her due course when arrested because of stress of weather, or other necessity compelling or justifying it, or whether she made a deviation intentionally, and under circumstances importing culpability on her part, is of moment on the issue between the parties. The master and mate differ broadly in their testimony on the point, and they speak positively upon a personal knowledge of the facts. The seaman adopts essentially the representations given by the master of the occurrence set forth in answer to the 36th interrogatory, but qualifies the force of his statement most essentially, by auding: "I only answer this question on information and belief, having no personal knowledge of the matters inquired of." The log of Saturday, January 25th, Sunday, the 26th, and Monday, the 27th, notes the weather each day, to the hour of capture on the 27th, as being generally clear, the sails all drawing. It remarks on Saturday that the middle of the day was partly squally, with light rain showers and baffling wind, and the latter part fresh breezes, but set the square sail; on Sunday, that the square sail and topsail were taken in—not certain of position of ship; sounded in 18 fathoms, and jibed ship—strong breezes; that Monday came in clear, and at 3:30 struck on shoal of Bay Caillou, and at 3:51 was boarded by the United States ship-of-war and taken in charge. Her log was kept in an exceedingly loose and unseamanlike manner. These facts, however, appear distinctly enough upon it: that the vessel left on this voyage, and commenced keeping sea time at 2 p. m. on Saturday, the 18th of January, 1862, though it omits entering her port of destination or departure. The latter, it is to be implied, was Havana, because the preceding entry ends with the ar-

rival of the vessel there, December 23, 1861. On Monday, Tuesday, Wednesday, and Thursday the vessel encountered heavy weather, amounting, on Thursday, to what was noted as a gale. She was hove to, and furled her sails, and made some water. No mention is made of her touching ground, or becoming leaky, during that period. The two passengers give no clear information as to the condition of the vessel or her navigation. They both of them avow their ignorance of the coast and of nautical matters, and their alarm in the storm, and anxiety that the master should put back or make a harbor. But it is evident, from the log and the testimony of the mate, that the storm or leaking of the ship in no way compelled him to seek shelter in Caillou bay. The gale had ceased and moderate weather had prevailed for more than two days prior to her attempt to do so; and the antecedents of the vessel and the character of her lading supply strong suspicions against the integrity of her movements. There is more weighing against them than the suspicions ordinarily recognized in prize courts, as violent presumptions affecting the innocency of a bottom unquestionably neutral in its character, which claims to be excused for seeking a blockaded port for necessary repairs, supplies, or shelter. An act done clearly from necessity, and fairly and with good faith, in entering a blockaded port, will be excused: but such allegations are regarded with distrust, and satisfactory evidence is demanded of the reality and urgency of the necessity. The Arthur, Edw. Adm. 202; The Fortuna, 5 C. Rob. Adm. 27; The Christianburg, 6 C. Rob. Adm. 376. In this case, the evidence shows that the attempt to enter the blockaded port was not compelled by any suffering or peril of the vessel or cargo. It was made in calm weather, two days after the cessation of any dangerous wind, or any evidence, from the pumps of the vessel, or otherwise, that she had sustained any positive injury in the gale; and the peril seems to have been unnoticed and unknown by the mate and seaman, or any one else having the management of the vessel. The alarms of the two passengers rested upon no facts, and were founded on their ignorance and timidity alone; and the testimony of the master, as to the state of the vessel, and the cause of her proximity to the blockaded coast, affords no satisfactory justification for her efforts to that harbor.

Extrinsic facts and circumstances aggravate the suspicions as to the integrity of the doings and statements of the master. The latitude of Havana, noted at the foot of the log, was, by observation, 23° 58' north, and the longitude about 84° 40' west, which corresponds substantially with the ordinary maps and geographical descriptions. The mouth of the Rio Grande, and alleged port of destination, is laid down on the charts at about latitude 26° north, and longitude 98° west.

The vessel was arrested on the Louisiana coast, a few miles from the Mississippi, which, from the last previous entry on the log, would probably be about latitude 29° north, and longitude 89° 58' west. The daily distances run are not given in the log, and the courses are stated obscurely and imperfectly. The port of departure, Havana, and the alleged port of destination, Matamoras, approximate to nearly the same parallel of latitude, and are separated by several degrees of longitude, and by the entries on the log, the vessel was captured about nine days out, several degrees north of her declared destination. No adequate cause is proved for such deviation. It is not attempted now to fix, with mathematical exactness, the position of the points mentioned, because, without such minuteness of correspondence, the bearings of the facts is sufficiently indicated by showing that the vessel was actually running on a line terminating more than 300 miles from her destination, her course being about the same length as the distance between Havana and Matamoras, with no cause assigned therefor on the log, or by the testimony of the master, or of any of the ship's company. Nor is any reason intimated, in the proofs, for navigating several hundred of miles contiguous to the low and dangerous shores of Louisiana and Texas to reach a port lying southerly of those states and directly in front of Havana, and open to the sea. The master and mate state in their testimony that the vessel was steering a course wide of Matamoras when she was captured, and before she discovered the capturing vessel. Looking at the prominent facts in proof—that the vessel was owned by a New Orleans merchant, and commanded by an enemy master; that she had been during the blockade engaged in other voyages from and to New Orleans; that she had evaded the blockade in leaving and entering that port under the same master and owner; that she had also before entered and sailed from Caillou bay; that she was attempting, in this instance, to take in a cargo chiefly, if not wholly, the produce of the outward one, and adapted to the urgent necessities of the enemy; that the purpose was manifested in the preparation and conduct of the voyage of running the blockade at that place with full knowledge of its existence and efficiency; and, moreover, that no satisfactory evidence is produced, or is found in the preparatory examination, or the ship's papers, that a necessity existed for the vessel to make a port to obtain repairs or relief, being in distress, or that she deviated from the general course pursued by her during the voyage until the same morning, and immediately before her arrest,—I am satisfied, first, that the vessel and all the cargo not included within the claim of the claimants are enemy property; and second, that the vessel and her entire cargo are guilty of knowingly attempting to violate the blockade alleged in the suit;

and that, for these causes, the vessel and cargo are lawful prize of war, and must be condemned to be forfeited.

[After final decree, a motion to reopen the question of costs and the distribution of the proceeds of the prize property was denied. Case No. 8,984.]